## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| WILLIAM FORD III, | **Case No.:** 2:25-cv-13231 |
| Plaintiff, | |
| v. | **COMPLAINT AND** <br> **DEMAND FOR JURY TRIAL** |
| EQUIFAX INFORMATION SERVICES, LLC, | 1. **FCRA, 15 U.S.C. § 1681,** *et seq.* |
| Defendant. | |

Plaintiff William Ford III, ("Plaintiff") through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant").

## I.   <u>INTRODUCTION</u>

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      Unfortunately, however, this information has also became readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, Defendant/s acknowledge/s this potential for misuse and resulting damage every time it/they sell/s its/their [respective] credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5.       Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system,

and unfair credit reporting methods undermine the public confidence which
is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of
> all sorts of computerized data banks, the individual is in great danger of
> having his life and character reduced to impersonal "blips" and key-punch
> holes in a stolid and unthinking machine which can literally ruin his
> reputation without cause, and make him unemployable or uninsurable, as
> well as deny him the opportunity to obtain a mortgage or buy a home. We
> are not nearly as much concerned over the possible mistaken turn-down of a
> consumer for a luxury item as we are over the possible destruction of his
> good name without his knowledge and without reason. Shakespeare said, the
> loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) [*quoting* 116 cong. Rec. 36570 (1970)]
(*emphasis added*).

8.     In light of these important findings and purposes, Congress specifically noted

"a need to insure that [CRAs] exercise their grave responsibilities with fairness,

impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. 1681(a)(4).

9.     Plaintiff's Complaint arises out of Defendant's blatantly inaccurate credit

reporting, wherein Defendant reported to Plaintiff's potential creditors that Plaintiff owed

money on a tradeline that Plaintiff was no longer legally responsible for.

10.     Accordingly, Plaintiff brings claims against Defendant for failing to follow

reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit

reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant/s for its/their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

13.     Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. § 1391 because Defendant/s regularly transact/s business within this District, is/are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## III.     PARTIES

14.     Plaintiff is a natural person who resides in Detroit, Michigan and is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

15.     Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of consumer reports, as defined in 15 U.S.C. § 1681a(d)), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

16.    During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

17.    Defendant regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 USC § 1681a(d), to third parties. Defendant regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

18.    During all times pertinent to this Complaint, Defendant acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

19.    Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violations.

## IV.    FACTUAL BACKGROUND

### Summary of the Fair Credit Reporting Act

20.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

21.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit

reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

22.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

23.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

24.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

## **Factual Background**

25.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Defendant regularly purchases and obtains consumer bankruptcy information to include the consumer reports it sells to third parties for profit.

28.     Defendant's consumer reports generally contain the following information: (i) <u>Header/Identifying Information:</u> this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and (iv) <u>Credit Inquiries:</u> this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29.     Defendant obtains consumer information from various sources. Some consumer information is sent directly to Defendant/s by furnishers, and other information is independently gathered by Defendant/s from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

30.     Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information, with the intention of including such information in the consumer reports Defendant sells.

31.     Defendant's unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

32.     The diligence Defendant exercises in uncovering and recording consumer bankruptcy filings is not replicated in Defendant's subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

33.     Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in its/their own files.

34.     The vast majority of institutions that offer financial services, e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant/s) to make lending decisions.

35.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendant's reports.

36.     The information Defendant includes in consumer reports contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

37.     FICO Scores are calculated using information contained in Defendant's/s' consumer reports.

38.     Defendant knows that FICO and other third-party algorithms (including the algorithms owned by the CRAs, including Defendant) use variables or "attributes" derived

from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

39.     Defendant knows that FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

   a.  "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

   b.  The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

40.     Defendant knows that lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

41.     DTI compares the total amount a consumer owes (based on the total amount of debt reported by Defendant in its consumer reports) to the total amount a consumer earns.

42.     A consumer's income, however, is not included in their consumer report; only their amount of debt is. Consumers enter their income into credit applications. Therefore, DTI is not calculated in a consumer's credit score, but is a factor in credit decisions.

43.     The higher the amount of reported debt that a consumer has, or is reported to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit. Moreover, if credit is extended at all, consumers will be offered terms for lower credit limits and higher interest rates.

44.     Equifax is aware that DTI plays an impactful role in the evaluation of consumer credit applications, stating on its own website: "Lenders may consider your DTI ratio as one factor when determining whether to lend you additional money and at what interest rate. Generally speaking, the lower a DTI ratio you have, the less risky you appear to lenders."[1] [DELETE IF EQUIFAX IS NOT A DEFENDANT]

45.     A consumer who has obtained a bankruptcy discharge and has a discharged account inaccurately reporting with an outstanding or past due balance after the bankruptcy discharge therefore suffers greater harm than if that account was accurately reporting with a zero-dollar balance, especially if that account is a[n] [open account/open collections account/charged off account] with a balance asserted to be owed, as is the case here. [DELETE if none of the accounts at issue in your case are reporting a balance]

---

[1] *Debt-to-Income Ratio vs. Debt-to-Credit Ratio*,
https://www.equifax.com/personal/education/credit/score/articles/-/learn/debt-to-income-ratio-vs-debt-to-credit-ratio/

46.     The CRAs (through their Consumer Data Industry Association) created, maintain, and license the industry guidelines to furnishers through the Credit Reporting Resource Guide® ("CRRG"), detailing how furnishers should report consumer data to the CRAs using the Metro 2 Format and codes.

47.     The 2020 CRRG, pages 10-1, states that "Accounts of consumers who have filed petitions for Bankruptcy (Third Party Collection Agencies) . . . **must be deleted.**"

48.     Thus, Defendant/s is/are aware that collections for debts which were included in a bankruptcy should be deleted from a consumer's credit report following the filing of a bankruptcy.

49.     Defendant is well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged.

50.     In or around 2009, Defendant implemented its own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols., Inc.*, No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

51.     The *White* settlement makes clear that CRAs know or should know that pre-petition, unsecured consumer debts are typically discharged in Chapter 7 proceedings. *Benjamin v. Experian Info. Solutions*, 561 F. Supp. 3d 1330, 1340 (citing *Morris v. Experian Info. Sols.* 478 F. Supp. 3d at 769).

52.     Defendant's bankruptcy scrub software identified pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7, even when the furnisher does not update the accounts as discharged.

53.     In other words, Defendant's automated bankruptcy scrub assumes Defendant's notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendant will overwrite data reported by a furnisher according to its/their assumptions and algorithms.

54.     However, Defendant has intentionally chosen to disregard knowingly inaccurate open balances and payment obligations of certain types of pre-bankruptcy accounts in Defendant's software programming of its/their automated "bankruptcy scrub" it has been employing for well over a decade.

55.     Defendant also knows that it is rare for a pre-petition debt to be reaffirmed, or successfully challenged in an adversary proceeding.

56.     Further, Defendant knows that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket, as is required by bankruptcy law.

57.     Additionally, information indicating that a specific debt was reaffirmed or successfully challenged through an adversary proceeding (rather than discharged), can easily be retrieved from the same sources from which Defendant independently obtains consumer bankruptcy case information.

58.     Defendant also receives information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

59.     Despite the availability of accurate consumer information, Defendant regularly reports inaccurate information about accounts after consumers receive a Discharge Order.

60.     Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

61.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendant frequently reports information concerning pre-bankruptcy debts based on information it knows is incomplete or inaccurate.

62.     Consequently, Defendant regularly publishes consumer information that conflicts with information: provided by data furnishers to Defendant, already included in Defendant's credit files, contained in public records that Defendant regularly accesses, and/or sourced through Defendant's independent and voluntary efforts.

63.     Defendant routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

64.     Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendant's own files.

65.     Defendant also knows that failing to report the effect of a discharge on individual account tradelines, while reflecting a bankruptcy filing/discharge on a credit report, would understandably be understood to declare to potential creditors that the consumer had been in bankruptcy, but had not received a discharge of a particular account. This not only inaccurately/incorrectly reflects an outstanding debt, but would also reasonably suggest to a

consumer and those reviewing the consumer's credit report that the consumer was guilty of a bad act for which he did not deserve a discharge of a particular debt. [2]

66.     Defendant fails to employ reasonable procedures to assure the maximum possible accuracy of the information that it reports about consumers, including, but not limited to, account balances, account statuses, payment histories, and payment statuses.

67.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau (CFPB) complaints against Defendant for its inaccurate credit reporting following a Chapter 7 discharge.

68.     Thus, Defendant is on continued notice of its inadequate post-bankruptcy reporting procedures. More specifically, Defendant is on continued notice that its inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and/or payment statuses.

69.     Defendant has received and documented many disputes from consumers complaining that Defendant/s reported inaccurate information about them.

*Allegations Specific to the Credit Reporting of Plaintiff*

70.     Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about July 18, 2024, in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 24-46907).

---

[2] Indeed, a bankruptcy discharge is for the "honest but unfortunate debtor," *Grogan v. Garner*, 498 U.S. 279, 287 (1991), and will not be provided to someone who filed bankruptcy in bad faith, failed to report assets, fraudulently transferred assets, engaged in reprehensible pre-bankruptcy conduct such as fraud, defalcation or embezzlement, or caused willful and malicious injury. 11 U.S.C. §§ 727(a), 523(a).

71.     Plaintiff received an Order of Discharge on or about October 30, 2024.

72.     Thereafter, Plaintiff was not personally liable for his dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

73.     Defendant prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

74.     The allegations in this complaint against Defendant are based on the reporting by Defendant in Plaintiff's April 7, 2025 consumer disclosure.

75.     Defendant obtained notice of Plaintiff's bankruptcy discharge through its/their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by the CRAs in Plaintiff's consumer reports.

76.     In the Public Records section of Plaintiff's consumer reports, Defendant included the bankruptcy case number, court, filing date and the fact that Plaintiff's bankruptcy had been discharged.

77.     Defendant also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

78.     Defendant is aware that it is generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

79.     Defendant should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance but did not.

80.     Defendant failed to report **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 bankruptcy with a zero-dollar balance.

81.     Instead, Defendant inaccurately reported Plaintiff's Inlivian Housing Redefined collections account, starting with 3051************ and opened in March 2021 (the "Inlivian Account"), which pre-dated Plaintiff's bankruptcy filing.

82.     The Inlivian Account was included in Plaintiff's bankruptcy and discharged on or about October 30, 2024. Therefore, the Inlivian Account should have been reported as discharged in bankruptcy, and with a zero-dollar balance.

83.     However, Defendant inaccurately reported the discharged Account as a "Charge Off" account.

84.     Defendant additionally inaccurately reported the Inlivian Account with a balance of $2,956 instead of a zero-dollar balance.

85.     Additionally, Defendant inaccurately reported Plaintiff's Esurance Allstate Company account, starting with 3486*** and opened in March 2023 (the Allstate Account), which pre-dated Plaintiff's bankruptcy filing.

86.     The Allstate Account was included in Plaintiff's bankruptcy and discharged on or about October 30, 2024. Therefore, the Allstate Account should have been reported as discharged in bankruptcy, and with a zero-dollar balance.

87. However, Defendant inaccurately reported the Allstate Account as a "Charge Off Account."

88. Defendant additionally inaccurately reported the Allstate Account with a balance of $196 instead of a zero-dollar balance.

89. Additionally, Defendant inaccurately reported Plaintiff's Webbank/Fingerhut account, starting with 6369*********** and opened in September 2021 (the "Fingerhut Account"), which pre-dated Plaintiff's bankruptcy filing.

90. The Fingerhut Account was included in Plaintiff's bankruptcy and discharged on or about October 30, 2024. Therefore, the Fingerhut Account should have been reported as discharged in bankruptcy.

91. However, Defendant inaccurately reported the Fingerhut Account as a "Charge Off" account.

92. Defendant did not indicate that the Inlivian Account, Allstate Account or Fingerhut Account (collectively, the "Accounts") were discharged in bankruptcy or report the Inlivian Account and Allstate Account with zero-dollar balances, despite reporting Plaintiff's bankruptcy in the public records section of Plaintiff's consumer report and reporting other pre-bankruptcy accounts as "Discharged/Included in Bankruptcy Chapter 7," and/or with zero-dollar balances.

93. The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially whereas here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline

indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

94.     The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

95.     According to Defendant/s, a charge-off means the lender has written the account off as a loss and the account is closed to future charges, the time frame is generally between 120 and 180 days after the consumer become delinquent, and a charge-off does not mean that the consumer no longer owe the debt; the consumer is still legally obligated to pay the debt.

96.     Notably, the other national consumer reporting agencies, Equifax and Experian, did not inaccurately report the Accounts like Defendant.

97.     Upon information and belief, the furnishers of the Accounts each furnished information to Defendant that indicated Plaintiff's debts were included or discharged in bankruptcy, and/or had zero-dollar balances after the bankruptcy discharge, but Defendant rejected or otherwise overrode the data they/it received.

98.     Alternatively, Defendant knew from past experiences that the furnishers of the Accounts furnished inaccurate information regarding discharged debts, or has historically failed to employ reasonable procedures to ensure they properly update consumer debts after a Chapter 7 Bankruptcy is discharged.

99.     Nevertheless, Defendant blindly relied on the information provided by the furnishers of the Accounts even though this information conflicted with or was

contradicted by information contained in Defendant's records, as well as Defendant's knowledge regarding Plaintiff's bankruptcy and discharge.

100.    Defendant's reliance on the furnishers of the Accounts was therefore unreasonable.

101.    Defendant inaccurately reported that Plaintiff owed balance that Plaintiff did not actually owe, and also reported inaccurate account statuses and/or payment histories.

102.    Defendant inaccurately reported the Accounts as "Charge-Offs" after the Accounts were discharged in Chapter 7 Bankruptcy.

103.    Defendant failed to indicate that the InLivian Account and Allstate Account had zero-dollar balances.

104.    Defendant's reporting of the Accounts is patently false/incorrect and therefore inaccurate.

105.    If not patently false/incorrect, Defendant's reporting of the Accounts is materially misleading and therefore inaccurate.

*Plaintiff's Damages*

106.    Upon information and belief, had Defendant accurately reported the Accounts, Plaintiff's credit scores and/or DTI would have been better.

107.    Defendant's/ reporting of an additional $3,152 of debt which Plaintiff does not actually owe increases DTI since the debt is substantially greater, but the income is unchanged.

108.    The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed for bankruptcy.

109.    The inaccurate reporting by Defendant suggests to creditors that Plaintiff is guilty of a bad act and was not deserving of receiving a discharge of the Accounts.

110.    After Plaintiff's bankruptcy discharge, in or around April 2025, Plaintiff applied for credit with Synchrony Bank, but was denied due to Defendant's inaccurate reporting of the Accounts.

111.    Defendant's inaccurate reporting of the Accounts, along with additional information belonging to Plaintiff, was published to potential creditors by Defendant during the process of Plaintiff's credit application.

112.    As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

113.    As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

114.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, violation of Plaintiff's right to privacy, and anxiety.

//

## V.    COUNT I
### Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

115.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

116.    The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

117.    Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after a consumer Plaintiff received a Discharge Order.

118.    Defendant independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily reported the same in Plaintiff's consumer reports.

119.    When Defendant voluntarily procured and published Plaintiff's bankruptcy information, it had an obligation to ensure they followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

120.    Defendant knew or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendant knew or should have known of its obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

121.    These obligations are well established by the plain language of the FCRA, in promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendant from which Defendant is on notice of its unreasonable procedures concerning the reporting of discharged debts.

122.    Additionally, Defendant possesses or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

123.    Despite knowledge of these legal obligations, Defendant willfully and consciously breached its known duties and deprived Plaintiff of his rights under the FCRA.

124.    In this case, Defendant inaccurately reported accounts that Defendant knew pre-dated Plaintiff's Chapter 7 Bankruptcy, and were included and discharged by Plaintiff's bankruptcy discharge.

125.    Defendant had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information it published in Plaintiff's consumer reports, including Plaintiff's bankruptcy case number, court, date of filing and date of discharge.

126.    Defendant is also on notice from other tradelines reported by Defendant that indicate Plaintiff's accounts were included in and discharged in bankruptcy.

127.    Defendant received notice of Plaintiff's bankruptcy discharge through public records, its own files, and information provided by data furnishers.

128.    Defendant knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

129.   Yet in this case, Defendant reported the Accounts, which pre-dated Plaintiff's bankruptcy, as "Charge-Off" accounts without any indication the accounts were discharged. Additionally, Defendant reported the InLivian Account and Allstate Account without any indication those accounts had zero-dollar balances.

130.   Defendant had prior notice of its unreasonable procedures for reporting discharged debt.

131.   Defendant violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/report.

132.   Defendant also violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendant knew or should have known the information Defendant is/are reporting is inaccurate, and/or otherwise contradicted by information known by Defendant, reported to Defendant, and/or reasonably available to Defendant.

133.   Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

134.   Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

135.   As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

136.   As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

137.    Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting a balance for debts that were discharged in bankruptcy, and otherwise failing to report that the debts were discharged in bankruptcy.

138.    Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

139.    Defendant is a direct and proximate cause of Plaintiff's damages.

140.    Defendant is a substantial factor in Plaintiff's damages.

141.    Therefore, Defendant is individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment/s against Defendant for the following:

(a)    Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

(b)    An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)       An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)       An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2),

(e)       Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)       Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VII.    <u>JURY DEMAND</u>

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 14th day of October 2025.

*/s/ Landon T. Maxwell*
Landon T. Maxwell AZ #038439
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85TH Way,
Scottsdale, AZ 85258
Tel: 480-626-1975
Fax: 480-613-7733
Email: lmaxwell@consumerjustice.com
